**Archie V. LEWIS, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 12288.**

District of Columbia Court of Appeals.

Submitted June 29, 1978.[1]

Decided Oct. 3, 1978.

**1.** The case was set for oral argument; counsel for appellant appeared, saying that he had not received notice and was not prepared to argue. He moved for rescheduling of the case for oral argument. The court said that it would take the motion under advisement, reserving the right to treat the case as submitted in the event that the court concluded, after analysis of the briefs and issues, that oral argument would not be helpful. Having reviewed the case the court denies appellant's motion. This case is appropriate for summary disposition in accordance with the following opinion.

Richard T. Tomar, Washington, D. C., appointed by this court, for appellant.

Richard C. Otto, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Michael W. Farrell and David W. Stanley, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEBEKER, MACK and FERREN, Associate Judges.

FERREN, Associate Judge:

On February 14, 1977, after trial on a ten-count indictment based on a robbery and shooting incident on November 20, 1976, the jury convicted appellant on two counts of assault with a dangerous weapon. D.C.Code 1973, § 22–502.[2] The court sentenced him to prison for concurrent terms of five to fifteen years on each count. Appellant now challenges the judgments entered on the verdicts on the following grounds: (1) the trial court's refusal to allow appellant to testify on direct examination as to his own prior convictions; (2) the trial court's refusal to declare a mistrial after the jury announced its numerical vote prior to rendering a verdict; and (3) the trial court's failure to require the prosecutor to furnish at trial the impeachable convictions of all government witnesses.[3]

Although we find that neither of the first two grounds constitutes reversible error on the facts of this case, we must remand the case to the trial court for further findings as to appellant's third claim.

I.

For the government, Lamont Thomas testified that he was driving his automobile on the evening of November 20, 1976, accompanied by two friends, James Hicks and Tyrone Leach. As Thomas stopped the car at a traffic light at the corner of Stanton Road and Bruce Place, a man known to Hicks as "Titi" approached the passenger side and asked if any of the occupants of the car were interested in buying drugs. While Thomas was telling the man to get

---

**2.** In addition to the assault with a dangerous weapon counts, appellant had also been charged with three counts of robbery (D.C. Code 1973, § 22–2901), two counts of armed robbery (D.C.Code 1973, §§ 22–2901 and –3202), and one count each of grand larceny (D.C.Code 1973, § 22–2201), unauthorized use of a vehicle (D.C.Code 1973, § 22–2204), and receiving stolen property (D.C.Code 1973, § 22–2205). At the close of the government's case, the trial judge granted appellant's motion for judgment of acquittal with respect to the grand larceny and receiving stolen property counts. The government presented no evidence on one of the robbery counts, dealing with a theft alleged to have occurred some two weeks before the November 20, 1976, incident out of which the other nine counts arose. This count was dismissed upon government motion on April 13, 1977. The remaining seven counts were submitted to the jury with instructions to consider the robbery and assault with a dangerous weapon counts only if they found the defendant not guilty of armed robbery or the lesser included offense of assault with intent to commit robbery while armed.

**3.** Appellant also asserts that there was insufficient evidence to support the convictions. Our review of the record leads us to conclude that this claim is without merit.

away from the car, a second man, identified as appellant Lewis, walked up to the car with a shotgun and announced a "stickup."

At that point, according to government witnesses, the gunman pointed his weapon at Hicks, ordered him out of the front seat of the car, and told Titi to search him. Hicks did leave the car; but, as Titi tried to push him to the ground, Hicks broke free and fled the scene, leaving approximately $165 in cash and some papers "shoved . . under the seat." While Titi attempted unsuccessfully to pursue Hicks, appellant climbed into the back seat of the car and told Leach and Thomas to get out of the car and put their hands on the roof. Both men left the car as directed but immediately began running.

Hicks claimed to have stopped running about a block from the scene and to have turned back in time to see appellant fire the shotgun at Leach as he was fleeing. Thomas, running behind Leach, looked back to see appellant and Titi driving away in his car. He called to Leach, "They're gone. They got the car." Leach claimed to have turned then and also seen Titi driving appellant away.

Later that evening, Thomas and Hicks told Detective Alfred Jackson at Seventh District Headquarters that a man known to Hicks as "Archie" had attempted to rob them with a shotgun. Hicks then selected appellant's photo from an array shown to him by Detective Jackson. The next afternoon, Hicks spotted appellant entering a house at 3159 Stanton Road and called the police. Metropolitan Police detectives found appellant hiding in the closet of an upstairs bedroom of the house with a shotgun. The complainants identified the shotgun at trial, as did the owner of a tavern from which the shotgun allegedly had been taken some weeks earlier.

The defense presented two witnesses. Vernon Williams testified that James Hicks and several other men had been looking for appellant. Then appellant himself took the stand, testifying that he had carried his shotgun "for protection" upon learning from a man named "Titi," who sought out appellant at his girlfriend's house, that "there was somebody out there who wanted to see me." He further testified that upon going outside and seeing Hicks and others in a car—one of whom had a gun and told him to get into the car—he stepped instead behind a tree. At that point, according to appellant, Hicks and Titi fled, whereupon appellant fired his shotgun on the ground toward the car and ran back into the house. He fired, he said, because he feared that otherwise the men remaining in the car were going to shoot him first.

■ The evidence, of course, must be viewed in the light most favorable to the appellee—the government. We have set forth both versions of the incident, however, as background for an appeal where witness credibility—and thus opportunity for impeachment—is the central issue.

## II.

■ As to the first claim of error, we have held that the trial court should afford "defense counsel the same privilege traditionally accorded the government to bring out on direct examination damaging information about the defendant and his witnesses," including prior convictions. *Kitt v. United States*, D.C.App., 379 A.2d 973, 975 (1977). After reviewing the record, however, we have concluded—as we did in *Kitt* —that the trial court's failure to permit appellant to testify on direct examination as to his prior convictions was harmless error. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

During cross-examination, when appellant was impeached with prior convictions for armed robbery and petit larceny, the trial court immediately gave a limiting instruction. Moreover, appellant's version of the events on the evening of November 20, 1976, was directly contradicted in all essential details by the testimony of the complainants. While, as appellant points out, the verdict in this case presumably rested on the relative weights assigned by the jury

to the testimony of appellant and the complainants, we find it highly unlikely on this record that the jury's appraisal of appellant's credibility was influenced by the fact that his prior convictions were brought out on cross- rather than direct examination. Especially in cases such as *Kitt* and the present one, where a jury has been presented with two complete, detailed, mutually exclusive versions of the single event giving rise to the charges, the jury's assessment of the facts will in all likelihood have been determined by the plausibility of each story.

It is conceivable, after remand, *see* Part IV, *infra*, that appellant's position will be strengthened by discovery of impeachable convictions of the complaining witnesses that can be used at a second trial, giving both sides an opportunity to follow the *Kitt* procedure. If, however, there is no retrial attributable to other error, we are satisfied that a new trial would not be justified by this particular error alone.

### III.

After deliberating for more than a day, the jury sent the court the following note:

> We are hopelessly deadlocked on a decision. We have discussed the issues and have taken three votes. The result of the three votes are as follows: Eleven (11) jurors voted the defendant guilty on Counts three (3) and six (6), which are assault dangerous weapon. One (1) juror voted the defendant guilty on Count one (1) and four (4), which is armed robbery.

Upon being informed of the note's contents, counsel for appellant requested a mistrial. The trial judge instead instructed the jury to continue with its deliberations. We conclude that the trial judge acted properly; his failure to declare a mistrial was not error.

In *Jackson v. United States*, D.C.App., 368 A.2d 1140 (1977), we noted that "[i]t is error for a foreman to reveal the numerical split of the jury," but that "such a disclosure is not automatically grounds for mistrial." *Id.* at 1142 n.5. In *Jackson*, the jury's note revealing its division also advised the court that one of the jurors believed she could no longer participate, for she recalled an incident, similar to the one at trial, in which a family member had participated. The court thereupon read the jury members their oaths and made remarks which "intimated that [the single holdout] was guilty of either perjury or negligence in her response to questions on voir dire and that she was not complying with her oath as a juror." *Id.* at 1142. We held that those remarks were prohibitively coercive; they were directed toward a particular juror and might have had the effect of inducing that juror "to agree to a verdict by fear that a failure so to agree will be regarded as reflecting upon either his intelligence or his integrity." *Id.*

Here, however, the trial judge—aware of our holding in *Jackson*—was careful to give no supplemental instruction when informed of the jury's division; he simply advised the jury to continue deliberation. While we reaffirm that it is improper for a jury to reveal its numerical division—and we urge trial courts to make this clear to juries—we reject appellant's argument that the trial court's advice upon such revelation here amounted to impermissible coercion of the jury. *United States v. Diggs*, 173 U.S. App.D.C. 95, 107, 522 F.2d 1310, 1322 (1975), *cert. denied*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976). *See United States v. Jennings*, 471 F.2d 1310, 1313–14 (2d Cir.), *cert. denied*, 411 U.S. 935, 93 S.Ct. 1909, 36 L.Ed.2d 395 (1973); *United States v. Martinez*, 446 F.2d 118 (2d Cir.), *cert. denied*, 404 U.S. 944, 92 S.Ct. 297, 30 L.Ed.2d 259 (1971); *United States v. Williams*, 444 F.2d 108 (9th Cir. 1971); *Sanders v. United States*, 415 F.2d 621, 629–32 (5th Cir. 1969), *cert. denied*, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970); *United States v. Rao*, 394 F.2d 354 (2d Cir.), *cert. denied*, 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968).

### IV.

Appellant's final claim of error is the trial court's failure to require the government to supply defense counsel, at trial, with all impeachable convictions of govern-

ment witnesses.[4] This claim is based solely on the principle of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as discussed in this court's decision in *United States v. Engram,* D.C.App., 337 A.2d 488 (1975), *cert. denied,* 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976).[5] Appellant argues, more precisely, that although the prosecutor turned over the prior conviction record of witness Thomas, he improperly refused, even at trial, to honor defense counsel's *Brady* request for impeachable convictions of the other two government witnesses, Leach and Hicks, who may have had a juvenile record.

On the facts of this case, we perceive six issues: (1) whether impeachable convictions of government witnesses, when requested at trial, are *Brady* material; (2) if so, whether the government has an obligation to discover all impeachable convictions of its witnesses, as part of its responsibility to answer a defendant's *Brady* request; (3) if the government does not have that obligation, whether the prosecutor, for purposes of honoring a *Brady* request, shall nevertheless be deemed to "know" the records of all such impeachable convictions which happen to be in government files, in one office or another, within the prosecutor's usual reach—not just convictions listed in the prosecutor's own records; (4) if so, whether the government can be said to have "suppressed" records, within the meaning of *Brady,* if the records requested of the prosecutor are generally available to defense counsel through the court's Criminal Information Center; (5) in any event, whether juvenile delinquency adjudications are includable within the government's obligation to produce impeachable convictions; and (6) whether in this case—if the government

failed to produce impeachable convictions or adjudications in violation of *Brady*—this lapse might have affected the outcome, thereby requiring a new trial. We treat these issues in order.

A. This case concerns putative *"Brady* material," by which we mean exculpatory information, material to a defendant's guilt or punishment, which the government knew about but failed to disclose to the defendant in time for trial. *See United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *Brown v. United States,* D.C.App., 372 A.2d 557 (1977).

In *Engram, supra,* we considered the legal significance of pretrial defense requests, based solely on *Brady,* for all arrest and conviction records of government witnesses, not just the records of impeachable convictions. We reversed the trial court's grant of these requests, concluding that the information sought was not "material" to guilt or punishment within the meaning of *Brady.* In making this determination, however, we dealt only with arrest records and nonimpeachable convictions, for we noted the government's "usual practice" of furnishing "at trial the records of all impeachable convictions" of government witnesses. *Engram, supra* at 489, 492. We thereby suggested that any *Brady* claim with respect to impeachable convictions of government witnesses could be—and presumably would be—satisfied at trial. We thus left open the question whether all such impeachable convictions are, in fact, *Brady* material—the question to which we now turn.

---

**4.** D.C.Code 1973, § 14–305, provides in part:

    \*    \*    \*    \*    \*    \*

(b)(1) Except as provided in paragraph (2), for the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a criminal offense shall be admitted if offered, either upon the cross-examination of the witness or by evidence aliunde, *but only if* the criminal offense (A) was punishable by death or imprisonment in excess of one year under the law under which he

was convicted, or (B) involved dishonesty or false statement (regardless of punishment). . . . [Emphasis added.]

    \*    \*    \*    \*    \*    \*

**5.** Appellant's claim does not concern a defendant's right to subpoena impeachable convictions of government witnesses or otherwise to seek pretrial discovery pursuant to Super.Ct. Cr.R. 16 or any statute—issues which we do not reach.

There are two aspects to the issue. The first is whether, at the time of trial, the court—not knowing what impact such impeachable convictions are likely to have on the question of a defendant's guilt—should nevertheless deem them "material" and thus producible under *Brady*. The second is whether, on appeal, if the government has not disclosed all the impeachable convictions of its witnesses, the failure to do so constitutes reversible error.

■ As to the first question, we hold that if defense counsel, at trial, requests production of impeachable convictions of government witnesses, those convictions must be produced. There are many cases supporting this conclusion as a matter of due process, with *Brady* being the principal authority. *See, e. g., United States v. Quinn*, 364 F.Supp. 432, 445 (N.D.Ga.1973), *aff'd on other grounds*, 514 F.2d 1250 (5th Cir. 1975); *United States v. Houston*, 339 F.Supp. 762, 766 (N.D.Ga.1972); *United States v. Johnson*, 298 F.Supp. 58, 65 (N.D.Ill.1969); *United States v. Leta*, 60 F.R.D. 127, 131 (M.D. Pa.1973); *United States v. Jepson*, 53 F.R.D. 289, 291–92 (E.D.Wis.1971). The government has recognized this responsibility in its "usual practice" of making such convictions available at trial. *Engram, supra* at 489. For purposes of at-trial requests, therefore, the government itself acknowledges that the likelihood of materiality is sufficiently strong for the *Brady* rule to mandate production of all impeachable convictions of government witnesses—at least the convictions the government knows about.[6]

■ The other aspect of the *Brady* question—whether it is reversible error for the government not to produce impeachable convictions requested at trial—will turn on a retrospective inquiry: whether "the suppressed evidence might have affected the outcome." *United States v. Agurs, supra*, 427 U.S. at 104, 96 S.Ct. at 2398; *see Wiggins v. United States*, D.C.App., 386 A.2d 1171, 1176 (1978) (Ferren, J., concurring).[7] Thus, not every appellant seeking reversal on the ground presented in this case will necessarily prevail. The fact, however, that some impeachable convictions in the context of an entire trial will turn out to have been immaterial to a defendant's guilt or punishment should not becloud the basic point: due process, as elaborated in *Brady* and subsequent case law, requires at-trial production of the impeachable convictions of government witnesses, at least to the extent of the government's knowledge about them. Failure to produce these convictions may necessitate a new trial.

■ B. Appellant argues that the government's *Brady* obligation, at trial, to produce its witnesses' impeachable convictions is absolute; all such convictions must be discovered and produced. Appellant is wrong. Essentially, reversal of a conviction based on the *Brady* principle "involves the discovery, after trial of information which *had been known* to the prosecution but unknown to the defense." *United States v. Agurs, supra*, 427 U.S. at 103, 96 S.Ct. at 2397 (emphasis added). The *Brady* principle does not imply a prosecutor's duty to investigate—and come to know—information which the defendant would like to have but the government does not possess. *See, e. g., United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975), *cert. denied*, 425 U.S. 905, 96 S.Ct. 1498, 47 L.Ed.2d 756 (1976) ("*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess."); *Levin v. Katzenbach*, 124 U.S.App.D.C. 158, 162, 363 F.2d 287, 291 (1966) ("[W]e do not suggest that the

---

6. Although we settle the matter on *Brady* grounds, we note that D.C.Code 1973, § 14–305, while not by its terms mandating government disclosure of its witnesses' impeachable convictions, puts a gloss on the matter that can be said to reinforce the government's obligation to do so.

7. As noted in the concurring opinion in *Wiggins, supra*, interpreting *Agurs, supra*, the particular formulation of this retrospective inquiry will vary, depending, for example, on whether defendant did—or did not—make a specific request for the convictions, or whether the government knowingly permitted one of its witnesses to lie about prior convictions.

government is required to search for evidence favorable to the accused . . . .").
Thus, a defendant is entitled to learn about the impeachable convictions which the government itself possesses—and no more.

■ C. Although the government does not have a duty to investigate whether its witnesses have criminal records, its "knowledge" of such convictions, for *Brady* purposes, is not limited to the personal knowledge of the particular prosecuting attorney. The government, and thus its prosecutorial agent, is deemed to know about all prior convictions of government witnesses which happen to be listed in the government's records accessible to the prosecution; for example, from the United States Attorney's Office (including the Washington Area Law Enforcement System, WALES), the Metropolitan Police Department records file, or the FBI. *United States v. Esposito*, 523 F.2d 242, 248 (7th Cir. 1975), *cert. denied*, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1976) ("[T]he particular prosecutor's ignorance of the . . . existence [of the evidence] will not fully justify the Government's failure to produce it."); *United States v. Ott*, 489 F.2d 872, 874 (7th Cir. 1973) ("[T]he prosecutor is charged with the knowledge of his associates."); *Clarke v. Burke*, 440 F.2d 853, 855 (7th Cir. 1971), *cert. denied*, 404 U.S. 1039, 92 S.Ct. 718, 30 L.Ed.2d 731 (1972) ("[K]nowledge of the police is knowledge of the prosecutor . . . ."); *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964) ("Nor is the effect of the nondisclosure neutralized because the prosecuting attorney was not shown to have had knowledge of the exculpatory evidence. . . . [I]t makes no difference if the withholding is by officials other than the prosecutor."). *See Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Bryant*, 142 U.S.App.D.C. 132, 140, 439 F.2d 642, 650 (1971).

The test of knowledge were are adopting here—convictions listed in government records accessible to the prosecutor—is a cautious one requiring elaboration on a case-by-case basis. Our caution is derived from the unique relationship of the United States Attorney's Office (*i. e.*, of the federal government) to the District of Columbia criminal process, and from our resulting concern that the knowledge imputable to the prosecutor not be unreasonably pervasive—or unduly limited—by his affiliation with the federal, not the local, government. We do not resolve here, for example, whether United States government records in agencies not normally involved in the District of Columbia criminal process are "accessible" to the prosecutor for this purpose. Nor do we decide whether records technically belonging to the District government but routinely available to the United States Attorney are "government" records under the test. These questions require briefing and argument in a factual context.

■ D. We turn, next, to the question whether impeachable convictions known to the government were "suppressed" in the present case. The government's brief states that the prosecutor had no knowledge about any impeachable conviction of his witnesses, other than Mr. Thomas, and that he accordingly suggested "defense counsel 'go over to the Court's [Criminal] Information Center . . . and see if there are any convictions for him.'" If all impeachable convictions of witnesses Hicks and Leach, known to the government, were contained in the Criminal Information Center, and thus were readily available to defense counsel without legal process—then there was no "suppression" of *Brady* material.[8] *Cf. United States v. Ansani*, 240 F.2d

8. We judicially note that the Criminal Information Center contains criminal case records of the Superior Court and its predecessor, the Court of General Sessions. Our reliance on the availability to defense counsel of records at the Criminal Information Center is premised on the undisputed fact that defense counsel in the present case was aware of the identities of the government's witnesses well before trial commenced. (We also assume that the conviction records are listed under the witnesses' names known to defense counsel, not under aliases, and that in case of several listed individuals with the same surname, defense counsel will

216, 223 (7th Cir.), *cert. denied*, 353 U.S. 936, 77 S.Ct. 813, 1 L.Ed.2d 759 (1957) (bill of particulars properly denied where "such facts and information as were sought were within the knowledge of defendants . . or the defendants were in possession of the means of ascertaining the facts requested . . . ." [citations omitted]); *United States v. Skidmore*, 123 F.2d 604, 607 (7th Cir. 1941), *cert. denied*, 315 U.S. 800, 62 S.Ct. 626, 86 L.Ed. 1201 (1942) (same); *United States v. Ball*, 49 F.R.D. 153, 156 (E.D.Wis.1969) ("The government need not supply a defendant with documents to which he has equal access or to describe their contents in a bill of particulars."). If, however, the government had prior conviction records (accessible to the prosecutor) which were not accessible to defendant counsel at the Criminal Information Center

and were not disclosed at trial after his *Brady* request, then this evidence was "suppressed." [9]

The record here shows that the prosecutor, in responding to defense requests, focused solely on his own personal knowledge of prior convictions—or at most on the convictions contained in the court's public files. He did not answer with reference to the government's files generally. Thus, we cannot tell from the record whether impeachable convictions, known to the government, were suppressed.

■ E. The prosecutor noted that witness Hicks was "quite a young man," indicating that his record, if any, may have referred "to a juvenile matter which would not be an impeachable conviction." Thus, it is possible that the government knowingly

---

have no difficulty determining which one is the witness in the case). If defense counsel had not known the witnesses before trial, then of course the government's failure to deliver the impeachable convictions at trial would have been a suppression, irrespective of defense counsel's access to records at the Criminal Information Center.

9. We do not deal with the question whether defense counsel had a right to subpoena the impeachable convictions of known government witnesses prior to trial and, if so, whether failure to exercise this discovery right may, given certain circumstances, preclude a claim of suppression under *Brady*, despite the quite different backgrounds for a defendant's right to criminal discovery and the government's constitutional responsibility under *Brady*. The courts of other jurisdictions are divided on the first question. At least one court has granted pretrial discovery of a conviction record. *See Hill v. Superior Court of Los Angeles County*, 10 Cal.3d 812, 820, 112 Cal.Rptr. 257, 263, 518 P.2d 1353, 1359 (1974) ("[W]e believe that discretion should reside in the trial judge to determine whether to grant a motion for discovery of felony convictions in a 'rap sheet' of a prosecution witness."). The consistent refusal of the federal courts to allow such discovery, however, has been based, alternatively, upon findings that the denial of such discovery did not represent an abuse of discretion, *see United States v. Finley*, 571 F.2d 430, 432 (8th Cir. 1978) (per curiam); *Hemphill v. United States*, 392 F.2d 45, 48 (8th Cir.), *cert. denied*, 393 U.S. 877, 89 S.Ct. 176, 21 L.Ed.2d 149 (1968); *United States v. Cobb*, 271 F.Supp. 159, 162 (S.D.N.Y.1967), *aff'd on other grounds*, 396 F.2d 158 (2d Cir. 1968), or upon flat assertions, apparently not distinguishing between government

witnesses known and unknown to the defendant, that conviction records simply fall outside the scope of permissible discovery, *see United States v. Taylor*, 542 F.2d 1023, 1026 (8th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977) ("[C]riminal records of such witnesses are not discoverable."); *United States v. Battisti*, 486 F.2d 961, 965 (6th Cir. 1973) ("[C]riminal records of government witnesses are not discoverable under Rule 16(b)."); *United States v. Conder*, 423 F.2d 904, 910 (6th Cir.), *cert. denied*, 400 U.S. 958, 91 S.Ct. 357, 27 L.Ed.2d 267 (1970) (same); *United States v. McDaniel*, 428 F.Supp. 1226, 1229 (W.D.Okl.1977) ("The Government is not required to inform a defendant, prior to trial, of the criminal records of its witnesses."); *United States v. Withers*, 303 F.Supp. 641, 645 (N.D.Ill. 1969) (same); *United States v. Johnson*, 298 F.Supp. 58, 65 (N.D.Ill.1969) ("[S]uch requests have been held to exceed the scope of Rule 16"; rather, impeachable convictions are producible at trial under *Brady*). It is interesting to note that the American Bar Association has recommended that the prosecutor release such information. American Bar Association Project on Standards Relating to Discovery and Procedure Before Trial, Approved Draft, 1970, § 2.1(a)(vi) ("[T]he prosecuting attorney shall disclose to defense counsel . . . any record of prior criminal convictions of persons whom the prosecuting attorney intends to call as witnesses at the hearing or trial") and § 2.4 (upon defense counsel's request, the prosecuting attorney shall use diligent good faith efforts to ensure that all discoverable material in the control of the prosecuting attorney is made available to the defense).

withheld a witness's juvenile record from appellant's counsel because of a legal conclusion that such records are not producible. *See Brown v. United States,* 119 U.S.App. D.C. 203, 338 F.2d 543 (1964). In the light, however, of *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), we cannot conclude that all juvenile delinquency adjudications are not producible for impeachment purposes. Thus, the prosecutor's response may indicate that the government unwittingly failed to honor an obligation to the defense.

■ F. In summary, we have no way of knowing from the record whether, at the time of trial, there were impeachable convictions of witnesses Hicks and Leach, known to the government, constituting suppressed *Brady* material. Further, we cannot tell whether there were juvenile records of any government witness which, if analyzed under *Davis v. Alaska, supra,* and the *Brady* line of cases, would constitute suppressed *Brady* material. Because of the possibility that *Brady* material was suppressed, and that this evidence might have affected the outcome, appellant's conviction is potentially reversible. *United States v. Agurs, supra.* Accordingly, we must remand the case to the trial court for further proceedings and findings on these issues.

## V.

Procedurally, on remand, the trial court initially should inquire as to whether the government, at the time of trial, actually had knowledge, accessible to the prosecutor, that a government witness, in addition to Mr. Thomas, had a prior criminal conviction or delinquency adjudication. (Included here, therefore, will be a determination as to whether the United States Attorney's Office should be held to have access to the District of Columbia's juvenile records.) If the trial court concludes that the government had no knowledge of a prior conviction or adjudication, that will end the inquiry.

If it turns out that the government did know of a witness's criminal conviction or delinquency adjudication, the court shall make additional findings as to (1) whether the conviction could have been used at trial for impeachment given the criteria in D.C. Code 1973, § 14–305, and, if so, (2) whether the conviction had been suppressed within the meaning of *Brady.* If the court finds such suppression, it shall then (3) apply the appropriate test of materiality to the outcome and make related findings. *See United States v. Agurs, supra;* *Wiggins v. United States, supra,* (Ferren, J., concurring). In making these determinations with respect to a witness's delinquency adjudication, the court shall inspect the juvenile record in camera. *Cf. Rosser v. United States,* D.C.App., 381 A.2d 598 (1977) (discusses in camera determination under Super.Ct.Cr.R. 16 and the Jencks Act, 18 U.S.C. § 3500 (1970)).

If, after such proceedings, the trial court concludes that the government suppressed admissible evidence that might have affected the outcome, in violation of *Brady-Agurs,* the court shall order a new trial.[10] If the trial court concludes otherwise, appellants' convictions shall stand, subject to a right of appeal to this court.[11]

10. Inherent in the procedure on remand is our conclusion that due process requires disclosure of a requested but suppressed juvenile record when the trial court concludes that its use for impeachment, applying the criteria of D.C.Code 1973, § 14–305, might have affected the outcome. *United States v. Agurs, supra.* We believe that this conclusion is mandated by the *Brady* principle and supported by the Supreme Court's analogous, Sixth Amendment analysis in *Davis v. Alaska, supra,* where the Court concluded when bias was an issue: "The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Id.* 415 U.S. at 320, 94 S.Ct. at 1112. This issue, however, has not been the subject of comprehensive briefing. Accordingly, should the issue arise on remand, it is open to the government to argue—and the trial court to consider—whether, consistent with the Constitution, our due process conclusion could be otherwise.

11. In taking this approach we are following the remand procedure used in *Brooks v. United States,* D.C.App., 367 A.2d 1297, 1311 (1976).

In the event of an appeal of a trial court decision concerning a juvenile record, the court should seal the juvenile record as part of the appellate record pending our decision. More precisely, if the trial court finds that the juvenile record contains what would be an impeachable offense for an adult under D.C.Code 1973, § 14–305, the court may disclose to appellant's counsel that a juvenile record with an impeachable-type offense exists, in order to give counsel the fundamental issue to be briefed on appeal. Additional details of the juvenile record, however, should not be disclosed to appellant's counsel pending our review. *Cf. Reed v. United States*, D.C.App., 379 A.2d 1181 (1977) (documents inspected in camera for Jencks Act purposes shall not be disclosed to appellant's counsel while under review by this court).

We recognize that appellant's advocacy on appeal may be hampered, to some extent, by such limited access to the in camera analysis. We conclude, however, that the strong policy favoring confidentiality of juvenile records except in limited circumstances mandates this approach, and that three-judge appellate review of the trial court's findings and conclusions can adequately protect appellant's interests. Appellant would have the opportunity to brief and argue on appeal the *Brady* and *Davis* policies, as applied generally to juvenile records containing impeachable offenses within the meaning of D.C.Code 1973, § 14–305; and it would always be open to this court to relax confidentiality for purposes of appellant's argument if we deemed it warranted.

## VI.

We remand this case to the trial court for further proceedings, to result in additional findings, conclusions, and orders consistent with this opinion.

*So ordered.*