**Herbert D. BROOKS, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 10680, 13216.**

District of Columbia Court of Appeals.

Argued Oct. 5, 1978.
Decided Dec. 14, 1978.

---

Thomas Lumbard, Washington, D.C., appointed by the court, for appellant.

Steven D. Gordon, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, William D. Pease, Theodore A. Shmanda and Jerry D. Bernstein, Asst. U. S. Attys., Washington, D.C., were on the briefs, for appellee.

Before KELLY, KERN and MACK, Associate Judges.

KELLY, Associate Judge:

Appellant Brooks and three codefendants were charged in a three-count indictment with kidnapping while armed, kidnapping, and obstruction of justice. D.C.Code 1973, §§ 22–2101, –3202; –2101; –703, respectively. He was found guilty by a jury of kid-

napping. Immediately after trial appellant moved unsuccessfully for a new trial on the basis of newly discovered evidence. His appeal cites as error (1) the denial of his motion for a new trial; (2) the admission of evidence that at one point the complaining witness was placed in protective custody; (3) the denial of his motion made at the close of the government's opening statement for acquittal on two of the charged offenses; (4) the curtailment of his line of questioning attempting to impeach the complainant; and (5) the giving of a particular instruction on aiding and abetting. After sentence, appellant learned that the alleged newly discovered evidence that formed the basis of his motion for a new trial arguably had been known to the government during the trial. As a consequence, he moved once again for a new trial, and once again that *motion was denied. Appellant instituted a second appeal based on the denial of his second motion for a new trial, and the two appeals were consolidated by this court.*

## I

The facts of the case are not easily untangled. Juanita and Clarence McDonald were married on September 5, 1974.[1] At that time, Juanita filled out a marriage application on which she swore, under penalty of perjury, that she had never been married before. Juanita had in fact been married before her marriage to Clarence, and that previous marriage had never been dissolved. The McDonald marriage had difficulties which culminated on March 2, 1975, when Clarence shot Juanita and their infant son. Both survived, and Juanita pressed charges.[2] As the only competent

witness to the incident, she was the prosecution's principal witness.

On the evening of June 23, 1975, the events which led to the present charges against appellant took place. Clarence McDonald, along with appellant Herbert Brooks, John Cuthbertson, and William Dews,[3] arrived, after a period of heavy drinking, at the temporary residence of Mrs. McDonald.[4] Clarence entered the building alone; Brooks followed shortly thereafter. Clarence found his wife beating on the door of a neighbor, Terry Robinson, with whom she thought her husband was having an affair.[5] Perceiving, apparently accurately, that Clarence was going to try to persuade her not to testify against him on the pending charge of assault with intent to kill, Juanita attempted to escape Clarence. With the help of Brooks, Clarence succeeded in physically forcing Juanita down the apartment house steps and into a car in which the remaining two accomplices were awaiting.

The five proceeded on Suitland Parkway into Maryland. The journey was alternately tumultuous and calm, and the car finally pulled to the side of the Parkway. After an unsuccessful attempt to escape, Mrs. McDonald was forced by Clarence into some nearby woods. According to Mrs. McDonald, appellant Brooks then produced a "flat-like" gun and announced an intention to kill her because she had struck him repeatedly during the previous scuffle.[6] Mrs. McDonald testified that Brooks had difficulties loading his gun and started kicking her. When appellant once again announced an intention to kill her, Mrs. McDonald fled, running toward the highway.

---

1. Although the marital status of Clarence and Juanita McDonald is doubtful and forms the basis of this appeal, we refer to them as husband and wife.

2. McDonald was charged with assault with intent to kill. Trial was set for July 9, 1975.

3. Cuthbertson and Dews pleaded guilty to obstructing justice. At the time of this appeal, McDonald had not been apprehended.

4. After her release from the hospital, Mrs. McDonald took up temporary residence with a friend, Shirley Jones. Stephanie Jones, Mrs.

Jones' daughter, witnessed the incident and testified at trial.

5. At the time, Mrs. McDonald was armed with a large knife, which she subsequently broke and lost.

6. The jury apparently chose not to credit Mrs. McDonald's testimony concerning the existence of a gun, as it acquitted appellant on charges of armed kidnapping while convicting him of kidnapping.

Officer John Damadio had been patrolling the area, and, a few minutes before Mrs. McDonald made her escape, he pulled up behind the parked vehicle in which appellant and the others had been riding. After a few moments of conversation with Cuthbertson, Officer Damadio saw Mrs. McDonald running from the woods yelling, "You have to help me. They're going to hurt me. They're trying to kill me." Mrs. McDonald then ran into the highway and was struck by an oncoming car. Officer Damadio radioed for help and detained Cuthbertson and Dews. While still in the Parkway area, appellant was spotted and detained by Detective Kenneth Green of the United States Park Police. Appellant escaped only to be arrested on June 26, 1975. Mrs. McDonald was taken to Greater Southeast Community Hospital and placed in protective custody shortly after her release.

## II

■ Appellant first contends that the prosecution's failure to disclose to him, before trial, evidence of an act of perjury on the part of a key government witness denied him the opportunity for a fair trial. He cites two acts of perjury by Juanita McDonald and two bases for the resulting

denial of a fair trial. He notes that Mrs. McDonald lied when, in filling out her marriage application, she swore under penalty of perjury that she had never been married before that time. In fact, at that time she had been and was still legally married to another individual. Because Mrs. McDonald indicated at trial that Clarence McDonald was her husband and that she was legally married to him, appellant contends that Mrs. McDonald committed a second act of perjury on the witness stand during the trial. Appellant urges that because of both the effect of the actual perjury at trial and the fact that the government did not disclose what it knew or should have known concerning the perjurous acts of Mrs. McDonald, he was denied a fair trial. Because, however, the perjury and its effects are not "material" within the standard enunciated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and their progeny, we hold that the trial court's denial of appellant's request for a new trial based on these grounds was justified.

■ Appellant argues strenuously that the government had actual knowledge of the perjury and was duty bound to disclose its knowledge of it.[7] Because we base our

---

**7.** As noted below, we do not reach the question of imputed knowledge here. However, since the law on this subject has only recently come to the fore in this jurisdiction, it may be prudent to note this court's recent statement that

Although the government does not have a duty to investigate whether its witnesses have criminal records, its "knowledge" of such convictions, for *Brady* purposes, is not limited to the personal knowledge of the particular prosecuting attorney. The government, and thus its prosecutorial agent, is deemed to know about all prior convictions of government witnesses which happen to be listed in the government's records accessible to the prosecution . . . . [*Lewis v. United States,* D.C.App., 393 A.2d 109 at 116 (No. 12288, 1978).]

Although that case dealt with prior convictions of government witnesses, and is limited to its facts, *id.* 393 A.2d at 116, the analysis seems applicable to a situation such as the one here.

The normal rules of agency would have us impute the knowledge of one prosecutor to another prosecutor; the United States Attorney's Office would serve as a conduit. *See* Restatement (Second) of Agency § 272 (1957). Indeed, the policy of imputing that knowledge seems sound. Absent a time consuming and arduous investigation of good faith, *see* notes 8 & 11 *infra,* only a policy of imputing that knowledge which normally and justifiably should be available through the normal channels of interoffice communication can ensure the free flow of information and service to the ends of justice.

Were we to address this issue, we would not hold that the knowledge of one prosecutor should always be imputed to another prosecutor. At times, that rule would result in an unfair burden on the government. The better rule, as noted in *Lewis v. United States, supra* at 116, would be that this issue should be resolved on a case by case basis, looking to such variables as the materiality of the information, the nature of the information, and the degree of knowledge held by the person (or agency) with actual knowledge and the person (or agency) without knowledge. On the issue of imputed knowledge, *see Giglio v. United*

holding on the materiality of the undisclosed information, we need not reach the question of whether the government had actual knowledge of the perjury.[8]

Information in the hands of the government that is favorable to defendant and that "might . . . [affect] the outcome of the trial," *United States v. Agurs, supra* at 104, 96 S.Ct. at 2398, must be disclosed to the defendant. *Id.; Brady v. Maryland, supra.* The government, however, is under no duty to search its files in order to determine whether any such information exists. *United States v. Agurs, supra* at 109, 96 S.Ct. 2392; *Lewis v. United States,* D.C.App., 393 A.2d 109 at 115 (No. 12288, 1978). The onus is on the defendant to request such information or to make a general request for information in the hands of the government which is beneficial to his case. *Id.; see Brady v. Maryland, supra.* As the level of the materiality of the requested information increases, the specificity of the request which is required of defendant decreases.[9] *United States v. Agurs, supra* 427 U.S. at 104–07, 96 S.Ct. 2392.

In the case at bar, appellant made a general request for all exculpatory or helpful information. Therefore, appellant can now complain of a denial of due process only if he can show [10] that the information requested was material under the *Brady*

and *Agurs* test. This is true regardless of the good faith or bad faith of the prosecutor in responding to the request.[11] *Brady v. Maryland, supra* 373 U.S. at 87, 83 S.Ct. 1194.

The Supreme Court in *Agurs* set the boundaries on the concept of materiality when it noted that

. . . The defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal. . . . [However] the judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless-error standard. . : . [*United States v. Agurs, supra* 427 U.S. at 111–12, 96 S.Ct. at 2401.]

A general statement of the rule of *Agurs* is that information is material if it tends to be outcome-determinative of the case.

The issue in this case thus becomes: is the legal marital status of Juanita McDonald sufficiently germane to the outcome of the trial so as to render a jury verdict based on her testimony inherently unjust? We believe not.

Juanita McDonald did not, in reality, commit perjury through her testimony at trial. She did testify that Clarence McDonald was her husband, and she did make reference to her marriage to Clarence.

---

States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1971).

**8.** Nor must we address the issue of whether the motives behind the government's nondisclosure would affect the outcome of our inquiry. It is clear, however, that the motives or lack thereof (mere negligence) are not important. *Giglio v. United States, supra* at 154, 92 S.Ct. 763.

**9.** This sliding scale could also be applied to the concepts of materiality and knowledge. As the materiality of the suppressed information increases, the importance of the knowledge of the prosecutor as to the existence of the information in his files should decrease. Taken to the extreme, that sliding scale would say that if the prosecutor has possession, either actual or constructive, of information which is highly material to defendant's case, it would be grounds for a new trial if the prosecutor did not disclose that information to the defendant, even if the prosecutor had absolutely no knowledge

of the existence of the information. Such a rule would cut across the rules of law concerning imputation of knowledge and negligence on the part of the prosecutor.

**10.** The burden of proving materiality is on the defendant. *United States v. Agurs, supra* 427 U.S. at 112, 96 S.Ct. 2392.

**11.** The rule was succinctly stated in *Brady*:

We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. [*Brady v. Maryland, supra* 373 U.S. at 87, 83 S.Ct. at 1196, quoted in *United States v. Agurs, supra* 427 U.S. at 110 n.17, 96 S.Ct. 2392; *see* note 8, *supra.*]

Such statements, however, cannot be called perjury in the sense that appellant offers it. Black's Law Dictionary 1297 (4th ed. 1951), defines perjury as:

The willful assertion as to a matter of fact, opinion, belief, or knowledge, made by a witness . . . [under oath] . . such assertion being material to the issue or point of inquiry and known to such witness to be false.

When Mrs. McDonald made reference to her husband, she did not do so knowing that that reference was false and that the very fact of her marriage was material to the case. Appellee urges, and we agree, that terms such as "husband" and "marriage" cannot be reduced to their most literal legal meanings in order to justify a new trial here.

Appellant argues, with some persuasiveness, that the government's failure to disclose Mrs. McDonald's false statement on her marriage certificate denied him the opportunity to impeach her testimony. *See United States v. Akers*, D.C.App., 374 A.2d 874 (1977); *United States v. Engram*, D.C. App., 337 A.2d 488 (1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 793, 46 L.Ed.2d 648 (1976). He further maintains that the prejudice caused by the government's failure to disclose the perjury is compounded by the government's exclusive reliance on the testimony elicited from Mrs. McDonald. Although it is true that appellant could have advanced his case through impeachment of the lead witness' testimony, we cannot agree that the denial of the opportunity to do so warrants a new trial.

Impeachment of Mrs. McDonald as described above would not have influenced the outcome of the trial. Appellant did make an attempt to impeach her testimony.[12] The jury, however, still chose to credit that testimony to some degree.[13] Her statements were corroborated by other witnesses.[14] At best, appellant could have shown that Mrs. McDonald lied in the past in order to gain the state's permission to marry Clarence McDonald. Given the plethora of factors that could have motivated her other than an irreverence for truth and veracity, we cannot say that the judge below was incorrect in finding that the jury's verdict would not have been affected by such a line of questioning designed to impeach Mrs. McDonald's testimony.[15]

### III

Appellant's second contention is that the trial court erred in admitting references by the government to the fact that Juanita McDonald was placed in protective custody after the incident here in question. While we agree that the admission of these statements served no end of justice and

---

12. Counsel for appellant attempted to show that Juanita McDonald's testimony was internally inconsistent and made reference to events which were not physically possible. He attempted to impeach her credibility by showing, through her testimony, that she had been drinking on the night of the incident. Moreover, since the chain of events that made up the incident began with Mrs. McDonald's violent attack on her neighbor's apartment, the jury could have inferred that her character was questionable.

13. The jury apparently did not find Mrs. McDonald's testimony concerning Herbert Brooks' possession of a gun during the incident compelling, as it acquitted him on the armed kidnapping charge. To the extent that the jury displayed an ability to discriminate between Mrs. McDonald's corroborated and her uncorroborated testimony, our holding, that her commission of perjury at an earlier date is immaterial to the issues here, is further supported.

14. The government produced Mrs. McDonald's seventeen-year-old neighbor, Stephanie Jones, to testify as to the events which took place in Mrs. McDonald's apartment house on the night of June 23, 1975. It produced Annette Summers, the woman who was in the car that ran into Mrs. McDonald later that night. It also produced two park policemen who came to the aid of Mrs. McDonald on the Parkway. Although the government would have been hard pressed to make a case without Mrs. McDonald's testimony, it can hardly be said that she was its only witness.

15. Arguably, the only true act of perjury cited by appellant, the false swearing on the marriage certificate, has never been proved. It is possible that Mrs. McDonald was mistaken about her marital status at the time, or was confused when she swore to the truth of the certificate.

could have been harmful to appellant's case, we cannot agree that appellant suffered any prejudice from their admission. A statement of a witness will be excluded if its probative value is outweighed by its prejudicial effect. *United States v. Marcey*, 142 U.S.App.D.C. 253, 255, 440 F.2d 281, 283 (1971); *Macklin v. United States*, 133 U.S.App.D.C. 347, 349, 410 F.2d 1046, 1048 (1969); *Frank v. United States*, 104 U.S.App.D.C. 384, 386, 262 F.2d 695, 697 (1958). In our case, the fact that Mrs. McDonald was placed under protective custody was of little if any probative value. Appellee argues that that fact serves to corroborate and explain Mrs. McDonald's testimony in the same manner that evidence of prompt reporting helps corroborate a complainant's testimony in a rape case. The situations are not analogous, however. Because of the personal nature of the crime of rape, prompt reporting is indicative of truth and is encouraged. For a crime such as the one here, no such exigencies and peculiarities exist.

Although the probative value of the statements was minimal, the prejudicial effect of their admission was insufficient to warrant a new trial. The danger of allowing the jury to know that an individual was placed in protective custody is that the jury may draw an inference that the state is protecting that individual from the defendant. In this case, the complaining witness was being protected from harm, but the source of that potential harm was McDonald and not appellant. It seems clear from the record that the jury would draw the true inference and would not infer that Brooks was the object of the protection. The fact that the protective custody continued after appellant was apprehended, and the fact that the jury knew that, underscores the inference that Mrs. McDonald was being protected from someone other than appellant. Finally, to the extent that the government did not stress the fact of the protective custody, we see no reason to overrule the trial court.

We do not by this opinion authorize the admission of statements concerning the state's protection of key witnesses. All we say is that under the facts of this case, allowing the jury to hear the statements was not prejudicial error which requires reversal.

## IV

■ Appellant maintains as a third allegation of error that the trial court should have granted his motion for judgment of acquittal after the government's opening statement. There exists little case law from which to determine the standard for dismissal of an indictment at the completion of the government's opening statement. The United States Court of Appeals for the District of Columbia Circuit has held that where the government's opening statement failed to allege " 'wrongful conversion' or 'fraudulent taking,' " that omission "did not prejudice the defendant in making his defense" and thus did not justify a directed verdict. *Dobbins v. United States*, 81 U.S. App.D.C. 218, 219–20, 157 F.2d 257, 258–59, cert. denied, 329 U.S. 734, 67 S.Ct. 99, 91 L.Ed. 634 (1946) (emphasis in original). Other jurisdictions have used a similar standard. *See, e. g., Butler v. United States*, 402 F.2d 748 (5th Cir. 1968) (no error where statement set out charges and facts in relation thereto); *United States v. Levine*, 372 F.2d 70 (7th Cir.), cert. denied, 388 U.S. 916, 87 S.Ct. 2132, 18 L.Ed.2d 1359 (1967) (trial judge's virtual dismissal of charge because of government's failure to prove charge was error) (dictum).

We find that the government's opening statement in this case provided a sufficient basis to withstand a motion for directed verdict. The government stood ready to provide circumstantial evidence that appellant knew of the criminal charges that had been brought against McDonald and that he knew of McDonald's motives in going to see his wife. The government relied on statements made by Mrs. McDonald to show that appellant had a gun during the incident and was prepared to use it. On these proffers, a charge of obstruction of justice and armed kidnapping was justified.

We cannot agree that the trial judge abused his broad discretion in denying the motion for acquittal. Appellant argues that admission of evidence designed to prove that he was guilty of obstruction of justice had the concomitant effect of casting the shadow of guilt upon him in relation to the kidnapping charge. Surely, appellant cannot hope to succeed with an argument that says both that there was no evidence to prove a charge and that the prejudice resulting from the failure to dismiss on that charge is derived from admission of evidence in support of the charge.

V

Appellant's fourth and fifth contentions of error are without substance. Appellant first maintains that he was given no opportunity to impeach Mrs. McDonald's testimony that he was carrying a gun during the incident, basing his contention on the ruling that he could not ask Officer Wade (the officer in charge of the investigation) if the arrest warrant [16] contained any reference to a statement by Mrs. McDonald concerning the presence of a gun during the incident.

During a courtroom bench conference, the court advised appellant's counsel that he had a variety of avenues available to impeach Mrs. McDonald's testimony. One such option was to ask the chief investigating officer if Mrs. McDonald gave any officer a written statement making reference to a gun or made any such statement which was later reduced to a writing. Since Mrs. McDonald never adopted as her own statement the affidavit supporting the arrest warrant, a line of questioning based on that affidavit was not within the contemplation of the trial court. Another option available to counsel was to ask each investigating officer whether Mrs. McDonald had ever made a statement to him concerning a gun. Counsel pursued this approach with only two of the "forty or fifty" officers with

whom Mrs. McDonald spoke.[17] To the extent that appellant's line of questioning involved the introduction of objectionable hearsay and since he had other nonobjectionable options, we cannot say that the trial court's ruling was erroneous.

Appellant's final contention is that the trial court erred in instructing the jury as to aiding and abetting. He argues that from the instruction, the jury was allowed to infer Brooks' guilty knowledge, *i. e.*, scienter, from the guilty knowledge of Clarence McDonald. That reading of the instruction is simply incorrect.

The trial court instructed, in part, that

A person aids and abets another in the commission of a crime if he knowingly associates himself in some way with the criminal venture with the intent to commit the crime, participates in it as something he wishes to bring about, and seeks by some action of his to make it succeed. [Criminal Jury Instructions for the District of Columbia, No. 4.02 (3d ed. 1978).]

We can see nothing in this instruction that would allow the jury to convict appellant without finding, as it did, that he intended to and did aid in the kidnapping of Mrs. McDonald.

VI

Appellant requests that we consider the synergistic effect of his five incidents of error and hold that even if no single error warrants reversal, the cumulative effect of error in the trial court denied him a fair trial. We do consider that cumulative effect and conclude that appellant was not denied a fair trial.

*Affirmed.*

---

**16.** Counsel's line of questioning centered on affidavits in support of the arrest warrant. It is unclear from the record whether the arrest warrant in question was for appellant Brooks or Clarence McDonald.

**17.** Although Mrs. McDonald testified that she spoke to forty or fifty officers, she could not identify them by name.