Kevin SMITH, Appellant,

v.

UNITED STATES, Appellee.

Nos. 93–CF–1359, 94–CO–
1133, 94–CO–1672.

District of Columbia Court of Appeals.

Argued Oct. 3, 1995.

Decided Nov. 27, 1996.

538

Jody Goodman, appointed by the court, Washington, DC, for appellant.

E. Vaughn Dunnigan, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Joan Draper, were on the brief, for appellee.

Before WAGNER, Chief Judge, and TERRY, Associate Judge, and BELSON, Senior Judge.

WAGNER, Chief Judge:

Appellant, Kevin Smith, was indicted for second-degree murder while armed (D.C.Code §§ 22–2403, –3202 (1996)). Following a jury trial, Smith was convicted of voluntary manslaughter while armed, the lesser-included offense of the offense charged in the indictment. The trial court (Judge Peter Wolf) sentenced Smith to a term of incarceration of fourteen years to life, and Smith noted an appeal. He filed post-trial

motions to vacate conviction and sentence pursuant to D.C.Code § 23–110 (1996), for investigator fees, and for the appointment of a psychological expert. The trial court (Judge Wolf) denied the motions without a hearing on July 27, 1994, and Smith noted a timely appeal. On August 10, 1994, Smith filed a motion for reconsideration of the order denying his motion to vacate sentence. The court (Judge Geoffrey Alprin)[1] denied the motion, and Smith appealed. In his direct appeal, Smith argues for reversal on the grounds that the trial court abused its discretion in limiting his testimony about his prior contacts with the decedent and committed plain error in responding to a jury note on the issue of self-defense and in failing to give an instruction on involuntary manslaughter. He also contends that the combination of trial errors deprived him of due process. In his appeals from the denial of his post-trial motions, Smith contends that he was denied effective assistance of counsel in that counsel: (1) misinformed him of the applicable penalties which resulted in his rejection of a plea offer;[2] (2) failed to request a forensic examination by a psychologist; (3) failed to investigate the decedent's prior violent conduct; (4) failed to request instructions for involuntary manslaughter and to explain the "castle doctrine";[3] and (5) failed to prepare for and allocute at his sentencing. Smith also argues that the trial court erred in denying his post-trial motions for appointment of a psychologist and an investigator. We affirm.

### I.

On January 23, 1993, Smith killed Edward Atkins in Smith's apartment on Macomb Street, Northwest, in the District. At about 12:45 a.m. that morning, Kathy Fuller, Smith's neighbor on the floor above his apartment, was awakened by sounds from Smith's apartment. She heard a man crying, "Don't do this to me, man," and then "Help

me." Fuller called the police and reported the disturbance. Smith's next door neighbor, Carmencita Vicncio, testified that at about that same time, she heard against the wall in Smith's apartment, sounds like people "pushing each other in the wall," and then a man's voice crying out, "Stop it. Stop it. I'm sorry, Kevin. I'm sorry. Help. Help." Vicncio knew that it was not Smith's voice that she heard. Vicncio also called the police.

About three minutes later, Sergeant Michael Vincent and Officer Florena Osborne arrived at the apartment and knocked at Smith's door. Smith asked who was there, and one of the officers responded, "police." Smith asked them to wait a minute because he had no clothes on. About a minute later, Smith opened the door and told the officers that he was busy. According to the officers, Smith had a blanket wrapped around his shoulders and blood on his torso. They also observed blood splattered and smeared all over the walls and floor of the apartment. They found Atkins in the bathroom covered with blood. Atkins had puncture wounds on his face and head, and his left eye was hanging out of its socket. Sergeant Vincent asked Atkins who did this to him, to which Atkins replied, "Kevin ... Dreadlocks." The sergeant repeated the question, and Atkins repeated the answer. The officer asked Atkins if he knew Kevin and whether he was in the apartment. Atkins responded "yes" to both questions.

The sergeant asked Smith his name to which Smith responded, "Kevin Smith." One of the officers asked him what happened, and Smith replied calmly that he "stabbed [Atkins] with the scissors in self-defense." Smith also claimed that Atkins had punched him in the mouth. Sergeant Vincent testified that he looked for injuries to Smith's mouth, but he saw no blood, bruises or lacerations.[4] Officer Osborne, who administered first aid

---

1. The case was reassigned to Judge Alprin following Judge Wolf's retirement.

2. The plea offer was .to the same offense for which Smith was convicted.

3. *See Cooper v. United States,* 512 A.2d 1002, 1005 (D.C.1986)(The "castle" rule is "that one

who through no fault of his own is attacked in one's own home is under no duty to retreat.") (citation omitted).

4. The sergeant was shown Smith's arrest photo which showed Smith with blood on his face, lip and ear.

to Atkins, asked him why this had happened, and Atkins responded that he did not know. Atkins grabbed the officer's pant leg and pleaded, "Please don't let me die." The paramedics arrived, but it was too late to revive Atkins. The police found in the apartment scissors and a screwdriver or awl, the blade of which was covered with blood.

At the police station, Smith told Detective Rita McCoy that his face was swollen. She noticed superficial scratch marks on Smith's cheek and forearm, and she took Smith's photograph. Smith gave the police a signed written statement in which he described the events surrounding Atkins' death as follows:

> This is a guy that I had met just recently. He knocked on my door early this evening, I don't know what time. He came in briefly. He said that he would come back. He came back and brought some wild Irish Rose with him. He seemed to be drunk or high on something. The bottle was not full, it was almost empty. He came in and I was on the couch and he was at my little table. He just started disrespecting me in my own apartment. I told him he had to go. Things got loud and we started to fight. He picked up the scissors, I wrestled them from him and I just swung at him. In the thick of things I wanted to hurt him because he wanted to hurt me. At some point I lost it. I don't know what else.

Detective Mary Lanauze, who took the statement, asked Smith whether he recalled striking Atkins with the scissors that night, and he responded, "yes, yes, I recall."

Dr. Marie–Lydie Pierre–Louis, Deputy Medical Examiner, testified that she and other personnel counted over seventy wounds to Atkins' head before they stopped counting. There were also stab wounds on the left side of the decedent's neck and on his back.[5] Most of the wounds were paired. Dr. Pierre–Louis testified that the cutting wounds around Atkins' eyelids would have hindered his ability to defend himself due to the extensive blood flow. She also testified that there were paired wounds to the back and palm of Atkins' hands and wrists which were too numerous to count.

Smith's theory of the case was that he was not a violent person, but killed Atkins, a drug dealer who was pressing him for money he owed, in self-defense. A co-worker and close friend, Gail Maynard, testified that during the week of January 23, 1993, Smith had borrowed approximately $20–$30 and stopped by her office on the Friday before Atkins' death to repay the debt. At that time, they planned for Smith to return for Maynard after she finished her shift, but Smith never came back. Maynard testified that she was aware of Smith's drug problem.

Sherry Edmonds, who had known Smith since college, described Smith as soft-spoken and easygoing. She testified that she had seen Smith angry, but that he never became violent. She testified that she knew that Smith had a drug problem, and for a brief period, she managed his money for him. Jesse Frierson, Smith's fraternity brother and college roommate for two and one-half to three years, also testified that he had never seen Smith angry, but that Smith was a person who tried to remain cool.

Lorraine Hurd testified that she met Smith in October 1992 and visited Smith's apartment approximately five times between October and January 1993. She said that during her last visit, she heard a loud banging at Smith's door and that Smith became angry and did not answer it. A few minutes later, someone slid a note under the door, which read, "Call me." Thereafter, the telephone rang twice, but Smith refused to answer it. Hurd testified that she met Atkins one evening at Smith's apartment and that he left after Smith introduced them.

Smith testified that he grew up in foster homes in New Jersey and graduated from college and that he was employed as a data quality analyst in January 1993. He testified that he met Atkins in late 1991 or early 1992 through a maintenance worker in his apartment building who introduced Atkins as a source of drugs. Smith said that he and Atkins had used drugs in his apartment approximately five times and that he sometimes purchased drugs from Atkins on credit. He

5. Atkins' wounds were quite severe. Some of the wounds penetrated the skull into the brain.

testified that he and Atkins had numerous arguments about payments for the drugs. Smith described an argument which they had during a telephone conversation in which Smith detected that Atkins was very angry. Smith also testified that Atkins had stopped by his apartment without being invited and surprised him outside of the building. Smith said that the incident made him angry and fearful.

Smith testified that on the night of Atkins' death, Atkins showed up at his apartment unannounced between 8:00 p.m. and 9:00 p.m. Without opening the door, Smith told Atkins that he was busy. Atkins returned to the apartment about an hour later and walked in when he found that the door was open. Smith testified that he was lapsing in and out of sleep at the time, but he agreed to allow Atkins to use his telephone. Smith said he later became aware of movements in the apartment, and realized that Atkins was still there at his table.

Smith testified that he asked Atkins to leave, but he refused. An argument ensued, which escalated into pushing and fighting. According to Smith, Atkins grabbed a pair of scissors, and he tried to wrestle the scissors away from Atkins. Smith testified that "it just seemed like we were all over the apartment, hitting walls and just, you know, just knocking things around." Smith testified that he was afraid of Atkins because he did not know him or what he was doing. Smith admitted stabbing Atkins several times, although he could not recall how many times. Smith testified that he was frightened during the incident. Smith was taken to D.C. General Hospital that night, but he refused medical treatment.

There was evidence that Smith is five feet, seven inches tall and weighs between 140 and 150 pounds, and Atkins was 33 years old, five feet, ten inches tall, and weighed 145 pounds. The defense also introduced evidence that Atkins had metabolized cocaine in his system at the time of his death.[6]

## II. *Claim of Trial Errors*

### A. *Limitation on Testimony*

Smith argues that the trial court abused its discretion in precluding him from completing his trial testimony regarding his prior encounters with Atkins. He contends that the trial court excluded testimony that was relevant to the reasonableness of his perception of the altercation with Atkins and the degree of force that he believed to be necessary to repel the attack. Specifically, Smith contends that the trial court prevented him from developing fully evidence of Atkins' unannounced visits and his efforts to avoid Atkins. He cites the trial court's ruling sustaining the prosecutor's objections to descriptions of the times that Atkins came to his apartment uninvited, including one. time when he became particularly fearful of Atkins. He also claims that the trial court refused to permit him to explain why he did not receive medical attention the night of the crime.

■ We start our review recognizing that the trial court has "broad discretion to determine the substance, form, and quantum of evidence which is to be presented to a jury." *(William) Johnson v. United States*, 452 A.2d 959, 960 (D.C.1982). In making that determination, the trial court must consider any applicable evidentiary rules and determine "whether the evidence is relevant to a material issue and, when balanced against competing interests, is not likely to inflame or unduly prejudice the jury." *Id.* at 960 (citing *Brooks v. United States*, 396 A.2d 200, 206 (D.C.1978)(other citation omitted).) On appeal from the trial court's ruling this court "will not substitute its judgment for that of the trial court." *Johnson*, 452 A.2d at 960. "Our scope of review is limited to whether the trial court has abused its discretion." *Id.* (citations omitted).

■ We find no basis for reversal in the trial court's ruling limiting the scope of the testimony which Smith sought to elicit. Smith was permitted to present evidence that Atkins was a drug dealer who pressured

6. According to Dr. Pierre–Louis, "[t]he metabolite of cocaine [has] no action on the brain or heart or ... the body itself." It is a form of the substance which the body has broken down to allow it to be flushed from the system.

him for money that he owed him and who came to his apartment unannounced. Smith testified that he was afraid of Atkins, that he had had several arguments with him, including one which he described in some detail. There was also evidence that Atkins managed to get into the building where Smith lived without Smith's assistance in spite of the secured entry system which required visitors to be "buzzed in." When defense counsel asked Smith why he was afraid of Atkins, Smith responded, "Well, because I didn't know him. I didn't really know him...." Initially, as Smith points out, the trial court stated that evidence of past arguments between Smith and Atkins was irrelevant, if Smith claimed that he did not know Atkins.

While it does not necessarily follow that such evidence was irrelevant because Smith contended that he did not know Atkins that well, evidence of the type which Smith claims was excluded was in fact admitted. Specifically, evidence of these past encounters and Smith's fear of Atkins as a result were presented to the jury. The trial court requested defense counsel to make a proffer in support of his position. Defense counsel proffered only that the fact that Smith and Atkins had arguments in the past gave Smith reason "to avoid him on the evening of the incident." Defense counsel argued that "if [Smith] had fear of [Atkins] prior to the incident that these events occurred it goes directly to the reasonableness of the force that was used." The trial court determined that, absent a further proffer, the prior arguments were irrelevant. Defense counsel made no further proffer.

The evidence that Smith proffered fell far short of evidence of the victim's acts of violence or violent character. *See (William) Johnson, supra,* 452 A.2d at 961; *Johns v. United States,* 434 A.2d 463, 468–69 (D.C.1981). On this record, we find no error in the trial court's ruling.[7] Under these circumstances and considering the strength of the government's case as to the excessiveness of the force which Atkins used, even assuming any error, it was harmless. *See*

*Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) (The test for harmless error is whether we can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."); *Perritt v. United States,* 640 A.2d 702, 706–07 (D.C.1994).

Smith also claims that the trial court erred in precluding him from testifying about why he refused medical treatment. He contends that the trial court's ruling sustaining the government's objection on hearsay grounds to a question which would have elicited an explanation was erroneous. That testimony, he now contends, would have been that he was told there would be a wait of several hours for a doctor and that this was not hearsay because it was not being offered for the truth of the statement. Smith did not make this proffer in the trial court. The government objected to the testimony only "if the answer includes hearsay." The trial court sustained the objection only on that condition. Smith did not argue that the answer was not hearsay. Instead, he abandoned the question. Therefore, we find no error.

**B.** *Claims of Instructional Error*

Smith argues that the trial court erred in failing to instruct the jury on the "castle doctrine," and involuntary manslaughter. Smith did not request either instruction or object to their omission. Under Super. Ct.Crim. R. 30, a party must object to any error in, or omission from the jury instructions before the jury considers its verdict or forego the claim of error in that regard. *See Curington v. United States,* 621 A.2d 819, 821 (D.C.1993). Notwithstanding the strict language of the rule, this court will review a challenge to instructions raised for the first time on appeal for plain error. *Id.; Allen v. United States,* 495 A.2d 1145, 1153–54 (D.C. 1985) (en banc). Under the plain error standard, reversal is warranted only "where the error complained of is so clearly prejudicial

---

7. Smith did not proffer in the trial court or on appeal evidence of a different character than that covered by the evidence which was admitted.

There was no proffer that Smith and Atkins had any physical conflicts or even that Atkins had threatened Smith previously.

to the complainant's substantial rights as to jeopardize the very fairness and integrity of the trial." *Id.* at 1154; *Robinson v. United States,* 649 A.2d 584, 586 (D.C.1994). Smith concedes that his claims of instructional error are subject to plain error review.

### (1) *Reinstruction and the Castle Doctrine*

Smith contends that the trial court plainly erred in reinstructing the jury on self-defense in response to a note from the jury. The note stated:

Re: The issue of self-defense

Does the point of whether or not the accused acted in self-defense apply throughout the altercation or can the Jury conclude that at the beginning of the fight there was an issue of self-defense but at the time mortal wounds were inflicted there was no issue of self-defense?

Does this same principle apply to adequate provocation and mitigating circumstances?

The trial court proposed "ad libbing" an instruction which would explain essentially that "it is a continuum of activity over a period of time and circumstances can change and with the change of circumstances the necessity of self-defense, the imminence of danger and the reasonableness of continued conduct can change." Neither side objected to the court's proposal. The trial court essentially instructed the jury along those lines. It also reminded the jury that all of the self-defense instructions were applicable and that it did not intend to emphasize unduly any single instruction.[8]

During the course of reinstructing the jury, the trial court also stated the following:

In addition, in my instruction to you about excessive force I told you that even if the other person is the aggress[or] and the Defendant is justified in using force in self-defense he may not use any greater force than he actually and reasonably believes to be necessary under the circumstances to save his life or avoid serious bodily harm and the word I would emphasize there is circumstances. Circumstances can change over a period of time.

In addition, I instructed you to the effect that there is no duty to retreat or consider retreating when the Defendant actually and reasonably believes that he is in danger of death or serious bodily harm and that deadly force is necessary to repel that danger, but the law does say that a person should take reasonable steps such as stepping back or walking away to avoid the necessity of taking a human life so long as those steps are consistent with the person's own safety.

Smith argues that the foregoing instruction improperly informed the jury that he had a duty to retreat when he had no such duty. He contends that the principle requiring one to step back to avoid taking a human life is subject to an exception under the "castle doctrine," which does not require one to retreat if he is attacked in his own home through no fault of his own. *See Cooper, supra* note 3, 512 A.2d at 1005. We find Smith's argument unpersuasive.

First, rather than impose a duty to retreat, the challenged instruction states specifically that there is no such duty where one reasonably believes that deadly force is necessary to prevent his own death or serious bodily injury. The instruction is also consistent with the law in this jurisdiction, described as a middle ground, which "permit[s] the jury to consider whether a defendant, if he safely could have avoided further encounter by stepping back or walking away, was actually or apparently in imminent danger of [death or serious] bodily harm." *Gillis v. United States,* 400 A.2d 311, 313 (D.C.1979); *see also Cooper, supra* note 3, 512 A.2d at 1004. The question presented in *Cooper* was whether a person attacked in his own home by a co-occupant had any duty to retreat. *Id.* at 1005. This court held that "evidence that the defendant was attacked in his home by a co-occupant did not entitle him to an instruction that he had no duty whatsoever to retreat." *Id.* at 1006.

■ Smith's case, of course, does not involve co-occupants, but an acquaintance who remained in his home, according to Smith, after being asked to leave. These facts raise an issue not previously decided by this court,

---

8. The jury apparently had the instructions on tape in the jury room.

*i.e.*, whether one who is attacked in his home, through no fault of his own, by an invitee whose invitation has been withdrawn, has any duty to retreat at all. Smith argues that under the "castle doctrine," there is no duty to retreat under these circumstances. However, the status of that rule in this jurisdiction has never been squarely decided. *Cooper, supra* note 3, 512 at 1005; *United States v. Peterson,* 157 U.S.App. D.C. 219, 233, 483 F.2d 1222, 1237 (1973). We need not decide definitively whether the castle rule should apply. Since the issue is unresolved under current law, we do not deem the court's failure to instruct on that issue to be plain error. *See United States v. Warren,* 42 F.3d 647, 657–58 (D.C.Cir.1994). Moreover, the error, if any, was not "so clearly prejudicial to [Smith's] substantial rights as to jeopardize the very fairness and integrity of the trial." *Allen, supra,* 495 A.2d at 1153–54. As pointed out in *Cooper,* the so-called middle ground approach embodied in the type of instruction given in this case "appropriately permits the jury to consider the truly relevant question, *i.e.,* whether a defendant 'if he safely could have avoided further encounter by stepping back or walking away, was actually or apparently in imminent danger of bodily harm.'" *Cooper,* 512 A.2d at 1006 (quoting *Gillis, supra,* 400 A.2d at 313). Stated another way, the instruction as given, like the "castle doctrine," imposes no duty to retreat, but it "allow[s] a failure to retreat, together with all the other circumstances, to be considered by the jury in determining if there was a case of true self-defense." *Gillis,* 400 A.2d at 313. The castle rule would not have added significantly to the instruction as framed. Moreover, a principal issue before the jury in this case was whether Smith used excessive force in repelling the attack, an issue not dependent upon the rule applicable to the duty to retreat. For these reasons, we conclude that the trial court did not plainly err in failing to give an instruction or reinstruction on the "castle doctrine."

### (2) *Omission of Involuntary Manslaughter Instruction*

Smith argues that the trial court committed plain error in failing to instruct the jury on the lesser-included offense of involuntary manslaughter. He contends that the evidence shows that he did not intend to cause Atkins' death and that the jury could have found that he "killed Atkins by the 'intentional' act of stabbing him, but with a state of mind amounting to the 'nonconscious recklessness' described in *Comber* [*v. United States,* 584 A.2d 26 (D.C.1990)(en banc) ]," circumstances which Smith contends required an instruction on involuntary manslaughter.

■ *Comber, supra,* describes two types of involuntary manslaughter: criminal-negligence involuntary manslaughter and misdemeanor involuntary manslaughter. 584 A.2d at 48–49, 54–55. Criminal-negligence involuntary manslaughter may be found where a death results from "[a]n intentional act or intentional conduct done with no aim to cause death or serious bodily injury ... creates an extreme risk of death or serious bodily injury and amounts to non-conscious recklessness." *Id.* at 54. The intent necessary to be convicted of involuntary manslaughter is supplied under this category of the offense by "gross or criminal negligence, a term [ ] defined as lack of awareness or failure to perceive the risk of injury from a course of conduct under circumstances in which the actor should have been aware of the risk." *United States v. Bradford,* 344 A.2d 208, 215 (D.C.1975); *Hawkins v. United States,* 395 A.2d 45, 47 (D.C.1978). It is Smith's argument that the evidence supports a finding of involuntary manslaughter under this theory. He relies primarily upon his testimony that he "lost it" during the altercation as support for the claim. He also claims that his own testimony did not suggest that he killed Atkins intentionally.

■ Upon request, the trial court must instruct the jury on any lesser-included offense for which there is an evidentiary basis, when all elements of the lesser offense are within the greater offense. *Simmons v. United States,* 554 A.2d 1167, 1171 (D.C. 1989). "A trial judge can properly deny the requested instruction only if there is no factual dispute and a finding to the contrary on the only evidence at issue would be irrational." *Rease v. United States,* 403 A.2d 322,

329 (D.C.1979) (citing *Rouse v. United States*, 402 A.2d 1218, 1221 (D.C.1979) (citation omitted)).

In spite of the light burden placed upon a defendant for obtaining a lesser-included offense instruction, an involuntary manslaughter instruction does not appear to be warranted on the evidence presented in this case. Smith's statement that "[a]t some point I lost it," was preceded by his statement "[i]n the thick of things I wanted to hurt [Atkins] because he wanted to hurt me." The single statement upon which Smith relies, read in context, does not support the claim that he lacked the intent to injure Atkins or to cause his death or that he was unaware of the risk associated with his actions. *See Comber, supra,* 584 A.2d at 52. Moreover, the evidence of the severity of the decedent's wounds, including many of a defensive type to the hands and arms and well over seventy wounds to Atkins' head, undercut Smith's claim. "One who acts with the specific intent to kill or inflict serious bodily injury is guilty of murder," but if "accompanied by recognized circumstances of mitigation, however, the crime is voluntary manslaughter." *Id.* Smith acknowledged that he intended to hurt Atkins, at best under mitigating circumstances, which would support a conviction for voluntary manslaughter while armed, the offense for which Smith was convicted. Therefore, there was no error, and clearly no plain error, in the trial court's failure to include an involuntary manslaughter instruction in the charge to the jury.[9] *See Allen, supra,* 495 A.2d at 1154.

### C. *Smith's Due Process Claim*

Smith argues that he was deprived of his due process right because the cumulation of trial court errors prevented him from presenting a defense. A criminal defendant has a fundamental due process right to present a defense. *Bassil v. United States,* 517 A.2d 714, 716 (D.C.1986). That right will be shown to have been violated where a defendant "was prohibited from engaging in otherwise appropriate cross-examination," and that he was unable to "present evidence, testimonial [or] otherwise, in his own defense." *Id.* at 716 (citations omitted). For the reasons stated in section II A of this opinion, the trial court did not plainly err in limiting the scope of the testimony or in instructing the jury.[10] Smith was able to mount a defense which convinced the jury that he was not guilty of second-degree murder while armed, as charged in the indictment, in spite of the strength of the government's evidence. Under the circumstances, Smith's due process claim must fail.

### III. *Claims Under D.C.Code § 23–110*

Smith argues that the trial court erred in denying without a hearing his motion to vacate conviction and sentence pursuant to D.C.Code § 23–110. In his original motion pursuant to § 23–110, Smith contended that he was deprived of effective assistance of trial counsel in that his attorney: (1) misinformed him of the applicable penalties for the offense for which he received a plea offer; (2) failed to obtain a forensic examination for him by a psychologist; (3) failed to investigate decedent's prior violent conduct; (4) failed to request instructions for involuntary manslaughter and to explain the "castle doctrine"; and (5) failed to prepare for sentencing.

### A. *Standard of Review*

In order to succeed on a claim for ineffective assistance of counsel, a defendant must meet a two-pronged test.

---

9. In this jurisdiction, it has been said that generally " 'the trial judge should withhold charging on [a] lesser[-]included offense unless one of the parties requests it, since that charge is not inevitably required in our trials, but is an issue best resolved, in our adversary system, by permitting counsel to decide on tactics.' " *Bostick v. United States,* 605 A.2d 916, 920 (D.C.1992) (quoting *Walker v. United States,* 135 U.S.App. D.C. 280, 283, 418 F.2d 1116, 1119 (1969)).

10. Smith states, without argument in connection with his due process claim, that "the failure to have psychological testimony before the jury," denied him due process. This claim is a part of Smith's argument on his claims under D.C.Code § 23–110, which we address in the next section of this opinion.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Our review of counsel's performance is highly deferential. *Id.* at 689, 104 S.Ct. at 2065. In assessing counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation and internal quotation marks omitted). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2065.

In considering whether a defendant has been prejudiced by counsel's deficiencies, the question is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland, supra,* 466 U.S. at 686, 104 S.Ct. at 2064. The appellant has the burden of showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. The failure to meet the test for either prong of the *Strickland* test will defeat the claim. *See id.* at 697, 104 S.Ct. at 2069–70. "[T]he finding of ineffective assistance of counsel is a mixed question of law and fact . . . and upon review, we will not reverse the trial court's findings of fact if they are supported by evidence in the record." *Bowman v. United States,* 652 A.2d 64, 73 (D.C.1994) (quoting *Curry v. United States,* 498 A.2d 534, 540 (D.C.1985)).

Applying the *Strickland* test, we consider Smith's claims.

**B.** *Failure to Request Instructions*

For the reasons stated in Part II B of this opinion, Smith cannot prevail on his challenge to the court's ruling on the § 23–110 motion on the basis of counsel's failure to request instructions on involuntary manslaughter and the "castle doctrine." He cannot show that counsel's performance was deficient given the controlling law and the evidence of record. Therefore, Smith does not meet the test of demonstrating that the result would have been different had his counsel sought the instructions. *See Doe v. United States,* 583 A.2d 670, 674 (D.C.1990) (citing *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. at 2064).

**C.** *Counsel's Advice on Penalties*

Prior to trial, the prosecutor made Smith a plea offer to voluntary manslaughter while armed. Trial counsel incorrectly advised Smith that the charge carried a five-year mandatory minimum term of incarceration due to the armed element.[11] Smith contends that he rejected the plea offer based on counsel's erroneous advice. The government argues that, even assuming that Smith would have pleaded guilty but for his attorney's erroneous advice, he cannot show prejudice in the *Strickland* sense. Smith was convicted of the same offense to which he would have pleaded guilty had he accepted the government's plea offer. He was subject to the same penalties. The sentencing court stated in its order denying the § 23–110 motion that it "would not have altered defendant's sentence had he pled guilty to voluntary manslaughter while armed." Although the trial court imposed a substantial sentence, it did not impose the maximum sentence provided by law. Since the outcome would have been no different in this case had Smith entered a plea, there is no prejudice. *See Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 370–71, 88 L.Ed.2d 203 (1985). Accordingly, we reject this claim.

11. The mandatory minimum term referenced applies only where the weapon used was "any

pistol or firearm." *See* D.C.Code § 22–3202(a)(1).

### D. Alleged Failure to Investigate For Prior Violent Acts

■ Smith contends that his trial counsel should have investigated to determine whether Atkins committed violent acts other than the armed robbery for which he was convicted in 1981. He argues that if other bad acts had been discovered and introduced at trial, along with evidence of Atkins' conviction for armed robbery, the jury might have concluded that he did not use excessive force. Smith made no proffer that other bad acts existed. Therefore, there is no basis for concluding that any investigation which defense counsel might have undertaken would have disclosed anything which would have changed the outcome of Smith's trial. Thus, Smith has made no colorable showing of prejudice for this claimed deficiency in counsel's performance. *See Sykes v. United States,* 585 A.2d 1335, 1339 (D.C.1991).

The remaining question is whether trial counsel's failure to make a further attempt to introduce evidence of Atkins 1981 armed robbery conviction amounts to ineffective assistance of counsel. Prior to trial, the prosecutor made a motion *in limine* to preclude defense counsel from mentioning decedent's 1981 armed robbery conviction. The court reserved ruling until it heard the evidence of self-defense. Defense counsel made no further attempt to introduce evidence of Atkins' prior conviction.

■ In making a claim of self-defense, an accused may introduce evidence of prior violent acts committed by the decedent which were known to the accused. *Harris v. United States,* 618 A.2d 140, 143 (D.C.1992) (citing *Matter of M.W.G.,* 427 A.2d 440, 443

(D.C.1981) and *United States v. Akers,* 374 A.2d 874, 877 (D.C.1977)). Past acts of the victim's violence of which the accused was unaware may be introduced as evidence supporting the objective question of who was the first aggressor. *Raymond Harris,* 618 A.2d at 144 (citations omitted); *see Johns v. United States,* 434 A.2d 463, 469 (D.C.1981). Smith characterizes the issue to which the evidence was relevant as "whether [Smith] reasonably perceived that Atkins remained the aggressor throughout the altercation." The issue for which Smith claims the evidence was relevant to his own subjective state of mind and the reasonableness or extent of Smith's fear. "Such evidence will be relevant only if [Smith] knew about the victim's violent character at the time of the crime." *Johns,* 434 A.2d at 469. Since Smith does not claim that he knew about Atkins' prior conviction, the evidence would have been inadmissible.[12] *Id.* Therefore, Smith cannot show prejudice from counsel's failure to renew his request for its admission which would warrant a new trial.[13]

### E. Failure to Request Forensic Examination

Smith argued in his § 23–110 motion that trial counsel's failure to have him evaluated by a forensic psychologist and to present expert testimony concerning his state of mind at the time of the crime constituted ineffective assistance of counsel. Smith did not contend that he wanted to pursue an insanity defense. Rather, he claimed that a psychologist's explanation of what might have been motivating him during the com-

---

12. We note that Smith testified, "I knew—I felt, I got a good enough feel for [Atkins] to, to be around him I mean and to let him come into my apartment so that ... I felt pretty, pretty comfortable from what he showed me up to that point." Smith did not indicate that he knew of Atkins' prior conviction or that he feared him because of it.

13. As the government points out, assuming that Atkins was the aggressor, there was no evidence that Smith sustained more than superficial injuries, while he stabbed Atkins more than seventy times to the head alone. The trial court (Judge Wolf) stated in its order that it was "inclined to believe that the defendant used excessive force as

a matter of law, even though, out of an abundance of caution, the court allowed self-defense to go to the jury; [therefore,] further background about the deceased would have thus been irrelevant." *See Harper v. United States,* 608 A.2d 152, 155 (D.C.1992) (self-defense instruction may be denied under circumstances where excessive force is shown as a matter of law); *see also Fersner v. United States,* 482 A.2d 387, 393 (D.C.1984)(Thirteen hatchet blows to the back of the head in defense of another person who was being kicked, stomped or beaten, was excessive force as a matter of law.). The trial court's assessment of this case in light of *Harper* and *Fersner* has some validity.

mission of the offense probably would have affected the jury's verdict. The government argued that absent an insanity defense, "the principles of diminished capacity should not be incorporated into our rules of criminal adjudication." *Bethea v. United States*, 365 A.2d 64, 85 (D.C.1976), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977). The trial court ruled, consistent with the government's argument, that expert testimony concerning Smith's psychological make-up or state of mind at the time was irrelevant absent an insanity defense. On appeal, Smith persists in his contention that evidence of his psychological state, or mental condition not amounting to insanity, might have explained to the jury why his perception of a continuing threat was not unreasonable.

▬ Smith acknowledges that there is no defense of diminished capacity in the District of Columbia. *See Bethea, supra*, 365 A.2d at 85. In spite of this court's pronouncement in *Bethea* that the principles of diminished capacity should not be incorporated in our rules, Smith contends that the clear implication of the language of Super. Ct.Crim. R.

12.2 is that other evidence may be admitted which bears upon a defendant's mental condition.[14] In this case, he contends that the rule authorizes the admission of psychological testimony, not to show insanity, but to support his self-defense claim. Rule 12.2 is a rule of procedure and cannot be read as altering the substantive law of this jurisdiction on diminished capacity as set forth in *Bethea* and its progeny.[15] Smith has cited no cases which support his theory for the use of psychological evidence to explain his actions absent an insanity defense.[16] The novelty of the point which Smith advances here indicates that trial counsel's failure to pursue such a theory was not unreasonable "under prevailing professional norms." *Strickland, supra*, 466 U.S. at 688, 104 S.Ct. at 2065.

### F. *Failure to Raise an Insanity Defense*

▬ For the first time, on appeal, Smith contends that it was an omission of constitutional magnitude for trial counsel to fail to investigate the possibility of raising an insan-

14. Super. Ct.Crim. R. 12.2, which is captioned, "Notice of insanity defense or expert testimony of defendant's mental condition," reads in pertinent part as follows:

 If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of the defendant's guilt, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the Court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk.

15. The government takes the position that the addition of the phrase "or any other mental condition bearing on the issue of guilt," merely clarifies that the insanity defense may be raised for any mental condition, not just a mental disease or defect. Smith counters that *Bethea* limits the insanity defense to circumstances involving a mental disease or defect, and therefore the additional language of the rule must refer to other types of expert evidence which bears upon a defendant's mental condition and guilt where an insanity defense is not asserted. In fact, *Bethea* retained the definition of mental disease or defect found in *McDonald v. United States*, 114 U.S.App. D.C. 120, 124, 312 F.2d 847, 851 (1962) (en banc). *Bethea, supra*, 365 A.2d at 81. That definition is that " '[A] mental disease or defect includes any abnormal condition of the mind

which substantially affects mental or emotional processes and substantially impairs behavior controls.' " *Id.* at 70 n. 11 (quoting *McDonald*, 114 U.S.App. D.C. at 124, 312 F.2d at 851). In light of our disposition of the issue presented, we need not resolve whether the government's interpretation or appellant's interpretation is correct.

16. The only case which Smith cites in connection with the subject is *Mathews v. United States*, 539 A.2d 1092 (D.C.1988), which does not support his theory. In *Mathews*, the appellant, who was convicted of assault with a dangerous weapon, argued that the trial court erred in allowing the government to cross-examine him about his perception that the complaining witness was involved in an ongoing conspiracy against him. *Id.* at 1093. Mathews did not raise an insanity defense, but claimed that he stabbed the victim in self-defense. Recognizing that the issues for the jury's consideration related to Mathews own perceptions and whether they were reasonable under the circumstances, this court held that the trial court did not err in permitting "the government to elicit for purposes of the jury's consideration limited testimony bearing on the reasonableness of appellant's apprehension of the need to resort to self-defense under the circumstances surrounding the incident." *Id. Mathews* is not authority for the proposition that expert testimony of an accused's diminished mental condition may be used in absence of an insanity defense to support the reasonableness of his violent actions.

ity defense.[17] We will review claims of ineffective assistance of counsel never made in a § 23–110 motion on the basis of the trial record alone. *Taylor v. United States,* 603 A.2d 451, 459 (D.C.), *cert. denied,* 506 U.S. 852, 113 S.Ct. 155, 121 L.Ed.2d 105 (1992). Smith contends that the record reflects a bizarre situation in that he had no history of violence but committed an admittedly brutal crime, appeared to be calm or in a state of shock when the police arrived, and cooperated with them in the investigation.

■ When the police arrived at Smith's apartment, he delayed initially opening the door. He explained that he stabbed the decedent in self-defense when questioned about the incident. Atkins was still alive at that time. Smith was articulate and cooperative at the police station and gave a coherent account of the incident. Understandably, he appeared somewhat nervous, but according to the detective, he appeared to be normal, considering the circumstances. Smith said that he had been drinking a beer, but he was not drunk and that he was not under the influence of narcotics. He knew how long he had known the decedent. In his statement, he described how the incident occurred, including that he struck Atkins thirty or forty times. The record does not reflect that Smith had a prior history of mental illness. On the contrary, the pre-sentence report writer says that Smith reported no mental or physical health problems.[18] The brutality of the killing, without more, is insufficient to persuade us that counsel was deficient in failing to pursue an insanity defense. *See generally Bethea, supra,* 365 A.2d at 83–87.

### G. *Motion for Reconsideration*

■ Smith argues that trial counsel failed to prepare for and allocute adequately at sentencing and failed to provide live testimony at the sentencing hearing, thereby depriving him of effective assistance of counsel.

This challenge was raised for the first time in Smith's motion for reconsideration of the trial court's order denying his § 23–110 motion.[19] "The denial of a motion to reconsider is not an appealable order," and such a motion "does not toll the time for noting an appeal." *Taylor, supra,* 603 A.2d at 458 (citations omitted). In *Taylor,* this court dismissed for lack of jurisdiction an appeal from an order denying the defendant's motion to reconsider the denial of his motion under § 23–110 because it was not an appealable order. *Id.* at 458. Since the notice of appeal was filed more than seven months after the denial of the § 23–110 motion, the court could not construe the notice as having been taken from that order. *Id.* at 459. However, this court reviewed the claims on the trial record. *Id.*

Similarly, in this case, the appeal in case no. 94–CO–1672 from denial of the motion for reconsideration is not an appealable order. Although Smith noted a timely appeal from the denial of his § 23–110 claim, his original claim did not include the grounds he specified in his motion for reconsideration. Moreover, the appeal in case no. 94–CO–1672 comes too late to be considered as having been taken from the original order denying the motion. Just as in *Taylor,* our review of this claim must be limited to the trial record. *Id.* at 459.

■ The trial court record discloses no inadequacy in the allocution or counsel's lack of preparation. Defense counsel allocuted at length, detailing the positive aspects of Smith's life, including his educational accomplishments, employment history, unfortunate childhood experiences, and his remorse. Smith appeared prepared to, and did allocute in his own behalf, expressing his remorse and describing his childhood difficulties and the efforts he made to overcome them. We cannot conclude on the record alone that counsel committed "errors so serious that counsel

---

17. *See* D.C.Code § 24–301(j) (a defense of insanity must be raised when the accused enters plea of not guilty or fifteen days thereafter).

18. The report states that it was believed that Smith would benefit from drug treatment and a psychiatric/psychological evaluation to assist with his rehabilitation.

19. The trial court denied Smith's § 23–110 motion on July 27, 1994. Smith filed a motion for reconsideration on August 31, 1994. Smith appealed from the denial of the motion for reconsideration on December 30, 1994.

was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. at 2064.

### IV. *Post–Trial Motions for Investigator and Psychologist*

Finally, Smith argues that the trial court abused its discretion by denying his post-trial motions for appointment of a psychological expert and for fees to hire an investigator. Smith contends that the motion should have been granted to enable him to substantiate his claims of ineffectiveness of trial counsel with respect to the insanity defense, the applicability of expert testimony on the self-defense issue, and for presenting expert testimony at the sentencing hearing.

 This court reviews denials of post-trial discovery motions under an abuse of discretion standard. *See Gibson v. United States,* 566 A.2d 473, 478 (D.C.1989). "In exercising its discretion in ruling on a discovery request, the trial court must not act 'arbitrarily or willfully but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.'" *Id.* (quoting *(James) Johnson v. United States,* 398 A.2d 354, 361 (D.C.1979) (other citations omitted)). Courts may use suitable discovery procedures, civil or criminal, to aid in disposing of post-trial motions for discovery "in order that the new trial motion receive fair and meaningful consideration." *Gibson,* 566 A.2d at 478 (citation omitted).

 Smith had no history of mental illness and showed no indication of mental incompetence at the time of the crime or at trial. The trial court had the opportunity to observe Smith throughout trial and was in the best position to determine whether the appointment of a psychologist appeared necessary. Thus, Smith's behavior and the circumstances surrounding the case do not establish the need for an expert, and therefore appellant's motion was properly denied. *Cf. Dobson v. United States,* 426 A.2d 361 (D.C. 1981) (trial court erred in denying motion for court-appointed psychiatrist where appellant was adjudged incompetent to stand trial, was

receiving medication, had a history of psychiatric illness, and was hospitalized prior to the murder for the murder). Moreover, given the stated purpose for seeking the examination, and the absence of any claim of insanity, the psychological examination would have been of no value in obtaining a new trial. *See supra,* Section III E. We find no abuse of discretion in the trial court's order denying the request.

Smith's motion did not explain what he intended an investigator to find out regarding the decedent's background. The theories advanced in the post-trial proceedings are not viable for the reasons discussed in Sections III D and E of this opinion. However, even in the absence of an investigation, sufficient evidence was introduced at trial to give the jury an understanding for decedent's background and Smith's interaction with decedent. The jury learned that decedent was a drug dealer, that his temper would flare when he was owed money, and that decedent entered Smith's apartment uninvited and, when asked to leave, he attacked appellant with scissors. Therefore, the trial court did not err in denying the motion.

### *Conclusion*

Smith challenged the failure of the trial court to grant a hearing on his § 23–110 motions. Since all of the claims which he raises can be resolved as a matter of law or are subject to review only on the trial record, we reject his claim that the trial court erred in failing to grant him a hearing. *See Ellerbe v. United States,* 545 A.2d 1197, 1198–99 (D.C.), *cert. denied,* 488 U.S. 868, 109 S.Ct. 174, 102 L.Ed.2d 144 (1988) (hearing required "only when the claims cannot be disposed of by resort to the files and record").

For the foregoing reasons, the judgment of conviction and orders under review in appeal nos. 93–CF–1359, 94–CO–1133 are affirmed, and appeal no. 94–CO–1672 is dismissed for lack of jurisdiction.

*Affirmed.*